UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2011 MAY 20  P 12: 50

U.S. DISTRICT COURT
NEW HAVEN, CT

UNITED STATES OF AMERICA    :
                            :
                            :
           v.               :        No. 3:10CR193(EBB)
                            :
LEROY PRESSLEY               :

RULING ON MOTION TO SUPPRESS & MOTION TO DISMISS

The defendant, Leroy Pressley ("Pressley"), is charged in a two-count indictment with possession of a firearm by a convicted felon and possession with intent to distribute cocaine base. The evidence supporting these charges was seized during a search of Pressley's car. Pressley has moved to suppress the seized evidence on the grounds that the warrantless search of his car violated his Fourth Amendment rights. Because the charges in the indictment are based on the evidence seized during the search, Pressley also moves to dismiss the indictment. For the following reasons, Pressley's motion to suppress [doc. # 25] and his motion to dismiss [doc. # 26] are GRANTED.

## FACTS

Based on the testimony of Norwalk Police Officers Mark Suda ("Suda") and Brandon Collins ("Collins") and Canine Officer David Peterson ("Peterson") at the suppression hearing, the police reports admitted as exhibits at the hearing, including the incident report prepared by Officer Lipeika following his telephone conversation with an unidentified individual regarding Pressley's drug dealing, in addition to all other evidence in the record, the Court finds the following relevant facts to be established.

At approximately 19:30 on August 18, 2010, Officer Suda, a Norwalk police officer assigned to the Special Services Unit ("Unit"),[1] was driving an unmarked police car on routine patrol of various known hot spots for drug activity in the area around the Roodner Court Housing Complex ("Complex") in South Norwalk, Connecticut. Officer Suda was accompanied by four other Norwalk police officers who were also assigned to the Unit: Officer Sixto, Officer Depanfilis, Officer Lipeika, and Officer Collins. All five of the officers were dressed in Norwalk police raid gear with "Police NARC Unit" written in bold letters on the front and back of their shirts.

The Complex is know to be a high crime, open-air drug market for walk-up and drive-up narcotics sales. It had recently been the site of numerous drug arrests, weapons arrests and violent altercations involving weapons. Residents had also made frequent complaints about drug activity, loitering and trespassing at the Complex, despite the numerous "NO TRESPASSING" signs that were posted. The Complex is owned by the Norwalk Housing Authority which has a no trespass policy that restricts access to residents and persons visiting or accompanying residents.

While patrolling the Complex, Officer Suda observed a black Acura 3.2 TL with tinted windows and black rims that was backed into a legal parking space between Building 21 and a playground. He saw an Hispanic male, whom he knew as Carlos or Calixto Figueroa, fixing the car's front headlight. Officer Suda observed Pressley sitting in the driver's seat. The car was

---

[1]Officer Suda is also a member of the Alcohol, Tobacco and Firearms ("ATF") Task Force. In that capacity he investigates crimes involving gun-related activities in Norwalk.

running and the driver's side window was rolled down.[2]  Pressley was the only occupant of the car.  Upon seeing Pressley, Officer Suda "immediately turned to the other officers . . . [and] said 'that's Bugsy in the vehicle.  He's not supposed to be here.'"  As to what he meant, Officer Suda said "Pressley [had] been arrested prior, for criminal trespass in the complex, and he was also warned a few months prior, by me and fellow special services officers not to be in the complex, and he was issued a verbal warning, and he said he fully understood."  Officer Suda also noted that Pressley's vehicle, which had previously been gray, had apparently been painted black.  At the time of Pressley's last trespass, in May 2010, he was accompanied by a man named Joseph Melton.  Officer Suda also testified that he and his fellow officers in the Unit "had received information, not only from credible and reliable police informants, but also just residents of the complex" that Pressley was a narcotics dealer.  Officer Suda also made specific reference to an incident report written by Officer Lipeika on July 10, 2010 describing a telephone conversation Lipeika had with an unidentified person who said he/she resided at the Complex and reported that Pressley and another man were selling large amounts of crack cocaine and marijuana at the Complex around Buildings 11 and 12.  Later in his testimony Officer Suda also mentioned that the officers in the Unit had received information "from credible and reliable persons as well as just resident complainants" that following the June 18, 2010 arrest of Gavin Hammett "Pressley then took over the crack cocaine trade in the [Complex]."

According to the officers, when Pressley saw the police car he turned off the engine, got out of the car and stood next to it.  When Officer Suda stopped the police car, all five of the

---

[2]According to Officer Peterson, the hood of the car was open.

officers got out and walked up to Pressley's car. Officer Suda approached Pressley, who did not try to run away or throw anything on the ground, and began to conduct a field interview. He asked Pressley what he was doing at the Complex. Presley answered that he was there visiting his cousin, Tanya Smeriglio ("Smeriglio"), who owned the Acura.[3] When Officer Suda asked Pressley where she was, Pressley said she went to her house. When Officer Suda asked him where she lived, Pressley just pointed to the area of Building 20 or 19. None of the officers approached Figueroa, who Officer Suda believed was also trespassing, and Figueroa walked away.

Officer Suda then advised Presley that he was going to frisk him for weapons "just for officer safety." He said he decided to pat him down based on "[p]rior information that, you know, how dangerous Pressley is, that he's - - that he is a narcotics dealer. He does carry weapons." Officer Suda's pat down was negative for weapons. Suda then asked Pressley if they could search the car. Pressley, however, refused to give his consent and said it was his cousin's car and they should ask her for permission. This led Officer Suda to call for a narcotic detection canine unit to respond to the scene "to perform a narcotics detection search of the vehicle." He also asked dispatch to send marked units because a crowd was beginning to gather around them. During the approximately ten minutes they waited for the canine unit to arrive, the crowd grew larger and started to get agitated. According to Officer Suda, Pressley also became agitated and, as stated in Officer Suda's report, Pressley asked him "why [they] were doing this and fu-----

---

[3]The government initially challenged Presley's standing to suppress the search of the car on the ground that he had not established a privacy interest in the car. After Presley provided an affidavit establishing a sufficient interest, the government abandoned the standing issue.

with him." Officer Suda "advised Pressley of the information they had received and . . . that he was trespassing." Also during this time, Smeriglio, accompanied by Pressley's other cousin Tammy Morales, arrived at the scene. Officer Sixto interviewed both women and Officer Collins checked their IDs and other information. Smeriglio said she did not reside at the Complex. Morales lived in the Complex in Building 21. The women said Pressley was there to visit them. There is no indication that the officers asked Smeriglio for permission to search the Acura.

When the canine unit, consisting of Officer Peterson and Rainor, his trained, certified and accredited police service dog ["PSD"], and a marked police car driven by Office Schwartz arrived, Officer Suda briefed Officer Peterson. Officer Peterson asked Pressley for consent to search. Pressley again refused to consent. Officer Peterson and Rainor then conducted a full exterior check of the Acura for the odor of narcotics. Rainor alerted in two areas of the vehicle's exterior, the passenger side front-door area and the front license plate. After Officer Peterson advised Officer Suda of the positive alerts, Officer Peterson then had Rainor perform an interior sniff of the car. Rainor did not make any positive alert for drugs inside the car.

Based on the PSD's positive alert for drugs on the car's exterior, Officer Suda and Officer Depanfilis believed they had probable cause to search the car's interior. In the process of doing so, Officer Suda opened the center console and found a large sum of money in small denominations which he knew was common for narcotics dealers. He then opened the glove box and saw a fully loaded Smith & Wesson .38 caliber revolver. He immediately told Officer Collins and Officer Lepeika to place Pressley under arrest. Pressley was arrested, handcuffed and placed in the marked police car. There is no indication of the total amount of time that elapsed between the initial encounter and Pressley's arrest.

5

Because the crowd was yelling and getting agitated about Pressley's arrest, and because there had been several arrests at the Complex in the prior weeks during which the crowd almost "turned on" the police, Officer Suda decided to leave the Complex and take the Acura into custody for asset forfeiture reasons and "to just conduct a search of the vehicle." Officer Depanfilis drove the Acura to police headquarters where he and Officer Lepeika performed an inventory search pursuant to Norwalk Police Department's written motor vehicle inventory policy and prepared the required NPD motor vehicle inventory form. During the officers' search, they found 31.08 grams of crack cocaine, packaging material and nine envelopes of heroin in the "trunk area" of the car.

The next day, Smeriglio went to police headquarters and gave a statement. She said that she gave the 2003 black Acura TL to Pressley's girlfriend on August 18, 2010 to register for her. She said she had purchased the car from her cousin Krista McRae and that she had nothing to do with and had no knowledge about anything the officers found in the car.

Some additional relevant facts are contained in the various police reports that were admitted into evidence at the hearing. In particular, in Officer Lipeika's incident report which Officer Suda referred to in his testimony, Officer Lipeika states that, on July 10, 2010 he and Officer Collins were at the Complex investigating an unrelated complaint when he "was informed to contact an anonymous complainant [who left his/her telephone number and] wished to speak with [him] regarding a separate [n]arcotics complaint." According to Officer Lipeika, the caller told him there were two males selling a large amount of crack cocaine and marijuana in the area around Buildings 11 and 12. The caller identified one of the men as Jason or Joseph Bateman and described him as a white male in his late teens or early twenties, wearing a black

6

shirt with a white tank top underneath and jeans. The caller identified the other man as a heavy

set black male with a beard or goatee who went by the street name "Bugsy" and drove a Toyota

Rav 4. The caller said that Bateman would meet Bugsy inside the Complex and sell drugs. The

caller also said he/she had observed a lot of hand-to-hand transactions and "knew that Bugsy

would obtain his product through Gavin Hammett until his incarceration" and that since

Hammett was gone, "Bugsy and Batemen [had] been selling a lot of 'weight' (narcotics) in

Roodner Court." The caller then told Officer Lipeika that he/she observed Bugsy and Batemen

"running from Building 11 towards [Building] 12 until they were out of sight." The caller also

gave Officer Lipeika information about the cars Bugsy drove, specifically, a white SUV, a silver

Acura, a blue Acura and a new silver Toyota Rav 4. After this conversation, Officer Lipeika and

two other officers patrolled the area identified by the caller, but did not make contact with either

of the men. Back at headquarters, Officer Lipeika used an in-house police database to search for

information on both men the caller had identified. The search revealed that an individual named

Bateman matched the caller's description of the white male and also produced a mug shot of

Pressley that matched the caller's description of the other male called Bugsy. Officer Lipeika

further corroborated the information he received from the unknown caller by ascertaining that

Bugsy, a/k/a Pressley, was well known to the Norwalk Police Department through past police

incidents, that he was known to hang out in the Complex and that he had been issued an

infraction on July 3, 2010 while he was operating a grey Acura. Officer Lipeika's report also

states that he contacted the caller after he returned to headquarters that night, but his report

provides no details of that conversation. Officer Lipeika also said he planned to follow up on the

investigation, but it does not appear that any further investigation was conducted. While the

Court infers from this report that Officer Lipeika had a phone number where he could contact the caller that night, there is no indication that Officer Lipeika determined the identity of the person connected with that telephone number or whether the number was for a cell phone or a land line or otherwise made any attempt to ascertain the caller's identity, reliability or veracity.

In addition, Officer Suda's incident report states that "both [Officer Sixto and Officer Lipeika] stated that Pressley is commonly seen in Roodner Court in different vehicles usually late at night supplying several males with crack cocaine, heroin and marijuana for street level sales." He does not give any details about those sightings or advise who actually saw Pressley selling drugs. He did not mention this in his testimony at the suppression hearing.

Further, none of the officers' reports provided any information regarding the "credible and reliable" police informants or other residents who told them that Pressley had taken over the narcotics trade in the Complex. Indeed, there is no information as to the identity of those informants and residents or their reliability, veracity and basis of their knowledge or other details regarding their allegations of Pressley's drug trafficking.[4]

---

[4]At the conclusion of the suppression hearing the Court asked the government to articulate precisely the reasonable suspicion the officers relied on to support the canine sniff of Pressley's car. The government replied that reasonable suspicion was a combination of Pressley's history of trespass at the Complex, the information the officers had received from sources about Pressley taking over the drug trade at the Complex and the fact that Pressley had been identified about a month earlier by a resident of the Complex as dealing drugs there. The government took the position that this was sufficient justification for the canine sniff of the car, but said if reasonable suspicion became "more of an issue," Officer Suda could be recalled to the stand. The Court then asked if Officer Suda was still in the Courthouse, thereby implying that it considered the issue important. The government said he was, but would prefer not to recall him at that time. Although the Court indicated it would give the government the opportunity to recall Officer Suda or present additional evidence, the government did not request an opportunity to do so.

DISCUSSION

Pressley claims that the warrantless search of his car was unreasonable and was not supported by probable cause or reasonable suspicion of drug dealing. He asserts that, even if the initial stop was based on reasonable suspicion that he was trespassing, such justification did not support the canine sniff of his car for drugs. In other words, even if the officers had reasonable suspicion of trespass to support a Terry stop, they did not have reasonable suspicion that he was dealing drugs and thus extending the scope and duration of the stop to conduct the narcotics investigation violated his Fourth Amendment rights. Alternatively, he contends that the subsequent warrantless search of his car at police headquarters was not a lawful inventory search.

In contrast, the government justifies the interaction between the police and Pressley as either a valid search under the automobile exception or as a reasonable investigation in connection with a lawful Terry stop based on reasonable suspicion of both trespass and drug trafficking. It argues that the canine sniff of the car's exterior was legitimately related to the reasonable suspicion that justified the initial detention of Pressley; that the canine's positive alert for narcotics on the exterior of the car gave them probable cause to search the car's interior under the automobile exception to the warrant requirement; and the discovery of the weapon in the glove compartment gave them probable cause to arrest Presley.[5] The government further maintains that

---

[5]In post-hearing briefs the government asserts for the first time that after Smeriglio told the officers that she did not live at the Complex, they had probable cause to arrest Pressley for trespass and thus their actions thereafter were lawful as incident to his arrest. The Court finds this assertion unpersuasive. As the testimony and police reports establish, Officer Suda had already called for the canine unit to come and search the car for narcotics before Smeriglio and Tammy Morales arrived at the scene and identified themselves as Pressley's cousins and indicated that he was at the Complex visiting them. And even though Smeriglio did not live there, Morales did. Moreover, in their testimony and reports, the officers consistently maintained

9

the search of Pressley's car at police headquarters was a lawful motor vehicle inventory search pursuant to Norwalk police policies and procedures.

The Court's analysis of the lawfulness of the encounter between Pressley and the Norwalk police officers turns on whether the officers had reasonable suspicion to warrant the scope and duration of the detention and investigation on suspicion of drug trafficking.

**The Initial Encounter**

It is beyond dispute that a police officer may, in appropriate circumstances and in an appropriate manner, stop a person for the purpose of investigating possible criminal behavior. Terry v. Ohio, 392 U.S. 1, 22 (1968). The requirements of the Fourth Amendment that govern the permissible scope of such an encounter depends on how the encounter is characterized. E.g., Florida v. Royer, 460 U.S. 491, 497-500 (1983); United States v. Glover, 957 F.2d 1004, 1011 (2d Cir. 1992). If the encounter is consensual, the Fourth Amendment is not implicated and the police do not need any justification for the stop. If the purpose of the encounter is to conduct a limited investigation, the police must have reasonable suspicion that criminal activity is afoot. This type of encounter is know as a Terry stop. If the purpose of the stop is to make an arrest, the Fourth Amendment requires that the police have probable cause that a crime has been committed. Glover, 957 F.2d at 1011-13. Depending on the totality of the circumstances and the level of intrusion, an initial consensual encounter may become an investigative detention if the individual submits to police authority and reasonably believes he is not free to leave. E.g., United States v. Baldwin, 496 F.3d 215, 217-18 (2d Cir. 2007). Likewise, an encounter that starts as a limited

---

that they did not arrest Pressley until they found the firearm during their search of the Acura, at which time they arrested him for the firearm violation and the trespass.

investigative detention, *i.e.,* a Terry stop based on reasonable suspicion, may cross the line and become an arrest if it continues too long or if the officers do not employ the least intrusive means reasonably available to effect their legitimate investigative purpose. Royer, 460 U.S. at 500 (holding that when an encounter becomes too intrusive or lengthy to be classified as an investigative detention it becomes a full scale arrest); see also United States v. Newton, 369 F.3d 659, 674 (2d Cir. 2004); United States v. Perea, 986 F.2d 633, 745 (2d Cir. 1993).

Here, assuming that the government correctly characterizes the initial encounter as consensual, the encounter crossed the line and became a Terry stop when the officers frisked Pressley for weapons. At that point, Pressley submitted to police authority and was "seized." Terry, 392 U.S. at 19 n.16 (holding that a seizure occurs when an officer, by means of physical force or show of authority, restrains in some way an individual's liberty); United States v. Hooper, 935 F.2d 491 (2d Cir. 1991) (noting that a seizure under the Fourth Amendment is not defined by whether an individual has halted his forward progress in response to police conduct, but rather by the coercive nature of the police conduct); United States v. Crump, 62 F. Supp.2d 560, 564 (D. Conn. 1999) (holding that the officer's questioning of the defendant rose to the level of a Terry stop when he was frisked for weapons).[6]

## The Lawful Scope of the Terry Stop

As noted, a Terry stop is an intermediate response that allows officers to pursue a brief and

---

[6]In the context of a Terry stop, a limited pat down for weapons is permissible where a reasonably prudent officer would be warranted in the belief, based on specific and articulable facts and not on a mere inchoate and unparticularized suspicion or hunch, that he is dealing with an armed and dangerous individual. E.g., Maryland v. Buie, 494 U.S. 325, 332 (1990). Here, Officer Suda testified that he patted Pressley down for "officer safety" because he was a narcotics dealer. Pressley has not challenged the lawfulness of the frisk.

minimally invasive investigation of criminal activity when they lack the precise level of information necessary to give them probable cause for an arrest. E.g., United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007). Under Terry and its progeny, police are permitted to stop and briefly detain a person for investigative purposes if they have reasonable suspicion supported by specific and articulable facts that he is engaged in criminal activity. E.g., United States v. Casado, 303 F.3d 440, 441 n.1 (2d Cir. 2002). Although there is no precise definition of "reasonable suspicion," it is certainly more than an "inchoate and unparticularized suspicion or hunch," but less than probable cause and considerably less than a preponderance of the evidence. Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989). The subjective intentions or motives of the officer making the stop are irrelevant to the determination of reasonable suspicion. United States v. Bayles, 201 F.3d 116, 133 (2d Cir. 2000).

As to the degree of intrusion, the stop must be reasonably related to the circumstances that justified the detention in the first place. E.g., United States v. Garcia, 339 F.3d 116, 119 (2d Cir. 2003). United States v. Ceballos, 654 F.2d 177, 181 n.6 (2d Cir. 1981) (citing United States v. Vasquez, 638 F.2d 507 (2d Cir. 1980)); see also Terry, 392 U.S. at 20; Casado, 303 F.3d at 447. The officers must employ the least intrusive means reasonably available to verify or dispel their suspicion in a short period of time. The greater the intrusion, the stronger the justification for the officer's actions must be. Ceballos, 654 F.2d at183-84.

Put another way, in a Terry stop the police may make reasonable inquiries aimed at confirming or dispelling their suspicions of criminal activity, but their investigation must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance. E.g., Minnesota v. Dickerson, 508 U.S. 366, 372 (1993); Glover, 957 F.2d at 1011.

"Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And unless the detainee's answers provide the officer with probable cause to arrest him . . . he must then be released." Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984).

In determining whether the facts known to law enforcement officers at the time of a Terry stop support a reasonable suspicion, the court must (1) view the circumstances surrounding the stop as a whole; and (2) view those facts through the eyes of a reasonable and cautious police officer on the scene guided by his experience and training. E.g., United States v. Price, 599 F.2d 494, 501 (2d Cir. 1979). The court simply assesses the degree of suspicion that attaches to particular types of acts and asks whether, taken together, they justify an investigatory stop. Sokolow, 490 U.S. at 10. If, however, during the initial questioning of an individual the officer develops a reasonable, articulable suspicion that he is involved in other criminal activity, the officer may expand the scope of his inquiry beyond the reason for the initial stop. United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003). As the Supreme Court has instructed, in reviewing the reasonableness of the stop, the court asks whether there was a particularized objective basis for suspicion of illegal wrongdoing under the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 273 (2002).

**Reasonable Suspicion Supporting the Canine Sniff**

Here, the government maintains that the Terry stop was justified because the Norwalk police officers had both (1) reasonable suspicion that Pressley was criminally trespassing at the

13

Complex when they observed him alone in his parked car based on his history of trespass at the Complex; and (2) reasonable suspicion that Pressley was engaged in drug trafficking based on information from credible and reliable police informants and residents of the Complex that Pressley had taken over the drug trade at the Complex.

Considering the circumstances of the encounter as a whole and viewing the facts through the eyes of a reasonable and cautious police officer, the Court finds that the officers had reasonable suspicion that Pressley was trespassing at the Complex based on specific and articulable facts of his prior trespasses and thus were justified in detaining him for the time necessary to confirm or dispel that suspicion.[7] This is not the case, however, with regard to their claim of reasonable suspicion that he was dealing drugs. The officers have simply not provided specific, articulable and objective facts to justify their detention and investigation of Pressley for narcotics. And because the scope of that investigation, including the canine sniff of the car, was not reasonably related or carefully tailored to the legitimate basis for the stop – namely, trespass – the officers exceeded the bounds of reasonableness demanded by the Fourth Amendment when they detained him and conducted that investigation. E.g., Ceballos, 654 F.2d at 183, Glover, 957 F.2d at 1011. Moreover, there is nothing in the record showing that, during the initial questioning of Pressley regarding his suspected trespass, the officers developed a reasonable, articulable suspicion that he was involved in drug trafficking that would have warranted expanding the scope and duration of the stop.

---

[7]The Court notes that Officer Suda testified that he often uses "the instance of trespass to further investigations of other things . . . because [stopping someone on suspicion of trespass] is probably our best investigative tool . . . which leads to other things."

Simply put, the quantity and quality of the information about Pressley's drug trafficking was not sufficiently specific or reliable to constitute reasonable suspicion. See Alabama v.White, 496 U.S.325, 330 (1990) (explaining that reasonable suspicion depends on both the content of the information possessed and its degree of reliability). In particular, the information from the unknown caller lacked sufficient indicia of reliability, did not include any predictive information about future criminal conduct and was insufficiently corroborated. Further, the officers did not provide any information as to the veracity, reliability and basis of knowledge of the police informants and other unidentified residents who said Pressley had taken over the drug trade at the Complex. Indeed, none of the information regarding Pressley's drug trafficking which the officers possessed at the time of the Terry stop has been shown to be reliable, credible or sufficiently corroborated, either standing alone or in combination.

## Information From the Unidentified Caller

The information Officer Lipeika learned from the unidentified caller would form the basis of reasonable suspicion if it had sufficient indicia of reliability, *i.e.*, if there was information showing the caller's credibility, basis of knowledge and veracity. In other words, how the caller knew what he/she reported and why the officers should believe him/her. United States v. Elmore, 482 F.3d 172, 179 (2d Cir. 2007). Even in the absence of such indicia of reliability, his/her information would justify the Terry stop if the officers independently corroborated it, Alabama v. White, 496 U.S. 325, 328-29 (1990), or if he/she made predictions of Pressley's future criminal activity which the officers were able to corroborate to some degree. Elmore, 482 F.3d at 179 (citing Draper, 393 U.S. 307, 309-10 (1959)) (noting that in such circumstances police may infer that the informant had some sort of inside information as the basis of his knowledge). See also

Illinois v. Gates, 462 U.S.213, 243-45 (1983).

In the reasonable suspicion context, the caller's information is dependent on both its content and its quality. White, 496 U.S. at 329. A tip with a relatively low degree of reliability, requires more detail and corroboration to establish the requisite quantum of suspicion than a tip that is more reliable. Id. As the Second Circuit explained, the level of corroboration needed to establish an informant's veracity operates on a sliding scale with the informant's track record of reliability and whether his identity is known to law enforcement. If the informant has previously provided reliable information he will generally be presumed reliable without much, if any, corroboration. If the informant is anonymous and has no track record of reliability, substantial corroboration of his information is needed. If the informant is known but has no track record, more corroboration is needed than for an informant with a reputation for being reliable, but less than what is required of an anonymous informant with no track record. Elmore, 482 F.3d at 180-81.

Here, the caller provided no information as to his/her identity and there is nothing to indicate that Officer Lipeika discovered anything about the person or confirmed that he/she actually lived at the Complex. And although the caller provided a telephone number where he/she could be reached that evening, there is no indication whether the phone number was for a cell phone or a land line or whether Officer Lipeika or anyone else ascertained the identity of the person connected with that number. Further, there is no indication that the officers were able to contact the caller at that number after July 10, 2010. For these reasons, the caller's information has a low degree of reliability and it thus requires substantial corroboration to support reasonable suspicion. See White, 496 U.S. at 330; Elmore, 482 F.3d at 175-76;. Caldarola v. Calabrese, 298

16

F.3d 156, 165-66 (2d Cir. 2002) (citing <u>United States v. Rollins</u>, 522 F.2d 160, 164 (1975)).

Indeed, when it is broken down, the information the caller provided to Officer Lipeika demonstrates that it lacked both the quality and quantity of information needed to establish reasonable suspicion. Specifically, all the caller said was that (1) on July 10, 2010, two males were selling a large amount of crack cocaine and marijuana in the Complex by buildings 11 and 12; (2) one of the men was Jason or Joseph Bateman, who was white, in his late teens or early twenties and was wearing a black shirt with a white tank top underneath and jeans; (3) the other male was black, heavy set with a beard or goatee, drove a newer silver Rav 4 and went by the street name "Bugsy;" (4) Bateman would "come down" to meet Bugsy at the Complex and sell drugs; (5) he/she observed a lot of hand-to-hand drug transactions; (6) he/she knew that Bugsy obtained his product from Gavin Hammett until he was incarcerated; (7) since Hammett was gone, Bugsy and Bateman had been selling a lot of narcotics at the Complex; (8) at the time of the call, he/she saw Bugsy and Bateman run from building 11 towards building 12 until they were out of sight; and (9) Bugsy drove several cars including a white SUV, a silver Acura, a blue Acura and a new silver Rav 4.

Other than correctly identifying Bateman and Pressley, the caller basically provided innocent, easily verifiable details and allegations of past and then-occurring drug dealing which Officer Lipeika was not able to verify or corroborate. The caller provided virtually nothing from which one might conclude that he/she was honest or credible. The caller's reliability is not established merely because Officer Lipeika verified his/her description of Bateman and Bugsy, determined that Bugsy was Pressley's street name, confirmed that Bugsy was known to hang out at the Complex and learned that Pressley had recently been stopped in one of the cars the caller

17

described. White, 496 U.S. at 332 (holding that corroboration only of information that was readily available, generally known, or easily obtained does not demonstrate an informer's reliability); United States v. Person, 134 F.Supp.2d 517, 523-24 (E.D.N.Y. 2001) (noting that a tip does not provide a basis for reasonable suspicion merely because it was corroborated by easily obtained facts and conditions existing at the time of the tip) (citing Florida v. J.L, 529 U.S. 266 (2000)).

Moreover, while the caller's assertion that he/she personally observed Pressley selling drugs at the time of the conversation may establish the basis of his/her knowledge of Pressley's alleged drug dealing on July 10, 2010, it does not make his/her information sufficiently reliable because his/her accusations of criminal conduct were not independently corroborated. See Florida v. J.L., 529 U.S. 266, 272 (2000) (holding that reasonable suspicion requires a tip to be reliable in its assertions of illegality, not just in its identification of the individual involved); see also United States v. Simmons, 560 F.3d 98, 105 (2d Cir. 2009) (stating that police officers are required to corroborate allegations of criminal activity in some meaningful way); Elmore, 482 F.3d at 181 (same). That corroboration is missing here primarily because, as discussed below, the information the officers learned from the "credible and reliable" police informants and other unidentified residents of the Complex does not have its own sufficient indicia of reliability.

More importantly, the caller's information lacks reliability because he/she provided no predictive information whatsoever as to Pressley's future criminal activity. Thus, there was nothing of that sort for the officers to corroborate. As the Supreme Court has stressed, a tip must contain a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to the individual's future actions that would not ordinarily be easy to predict

18

and corroborate.  E.g., White, 496 U.S. at 333 (noting that the tipster's ability to predict the defendant's future behavior is important as it demonstrates inside information or a special familiarity with the defendant's affairs).

In sum, the caller's information only proved reliable in the limited sense that it helped the police correctly identify the persons the caller accused of drug dealing.  But the caller's identity was never learned, his/her accusations that Pressley had taken over the drug trade at the Complex and that he/she observed Pressley doing so that evening and on unspecified prior occasions was not sufficiently corroborated, and the caller did not provide any predictions of Pressley's future criminal activity that could be corroborated.  Without such indicia of reliability, the information provided by the unknown caller was not sufficient to form the basis of reasonable suspicion of Pressley's drug trafficking.  See United States v. Bond, 19 F.3d 99, 103-04 (2d Cir. 1994).  In other words, the caller's information, "standing alone, does not have the level of reliability that would warrant a man of reasonable caution to believe that the scope and duration of the stop on suspicion of drug trafficking was appropriate."  White, 496 U.S. at 333.

## Sufficiency of the Officers' Other Information of Drug Dealing

In addition to the information from the unidentified caller, the officers relied on information they learned from "credible and reliable" police informants and "other residents" that Pressley had taken over the drug trade in the Complex after Gavin Hammett and his organization had been arrested and taken into custody in June 2010.  While such information could be sufficient for reasonable suspicion, either standing alone, Adams v. Williams, 407 U.S. 143, 146-47 (1972), or as corroboration of the unknown caller's information, the mere conclusory assertion

that the informants were "credible and reliable" does not make it so.  Illinois v. Gates, 462 U.S. at 239.

Specifically, not one of the officers provided any facts or details to support the bald assertion that their informants were "credible and reliable" nor did they provide any other information from which the Court could assess their reliability.  Indeed, not one officer even said that the credible and reliable" informants had a track record of providing reliable information.  Id. (holding that a mere conclusory statement that an informant is reliable gives the fact finder virtually no basis at all for making a judgment regarding reasonable suspicion); United States v. Pena, 961 F.2d 333, 340 (2d Cir. 1992) (noting that one purpose of a suppression hearing is to provide an opportunity to adequately test an officer's conclusory assertion that his informant is reliable).  Moreover, there is no indication that the "credible and reliable" informants or "other residents" predicted a time or a location at the Complex where Pressley could be found selling drugs.  They just said Pressley had taken over the drug trade there.  The same is true with regard to the statement in Officer Suda's report that Pressley "is commonly seen in the Complex in different vehicles usually late at night supplying several males with [narcotics]."  This vague, non-specific and unparticularized assertion that Pressley had been sighted selling drugs at the Complex, without more, does not satisfy the reliability requirement and thus adds nothing to the mix of facts that purport to form the basis of reasonable suspicion of drug trafficking.  Nothing is said about who sighted him or when those sightings were made.

And while it is true that nervous or evasive behavior is a pertinent factor in determining reasonable suspicion, there is no indication here that Pressley was acting suspiciously or furtively at the time of the initial encounter.  Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (stating that

"nervous, evasive behavior is a pertinent factor in determining reasonable suspicion). Officer Suda only said Pressley became agitated while they were waiting for the canine unit to arrive and this is immaterial in determining whether they had reasonable suspicion at the time the canine unit was called. See United States v. Garcia, 339 F.3d 116, 119 (2d Cir. 2003). Moreover, Officer Suda failed to describe what Pressley did that led him to conclude he was "agitated."

Further, the fact that the Complex was a known hot spot for drug trafficking is a relevant contextual consideration, but without more, it is not enough to give the officers reasonable suspicion of drug dealing. Wardlow, 528 U.S. at 124.

In conclusion, although establishing reasonable suspicion is "not a high threshold," United States v. Lawes, 292 F.3d 123, 127 (2d Cir. 2002), "the Fourth Amendment imposes some minimal level of justification to validate [a] detention or seizure." INS v. Delgado, 466 U.S. 210, 216-17 (1984). This low threshold has not been met here. The government has failed to sustain its burden of proving that the information available to the officers, both individually and cumulatively, as well as the totality of the circumstances gave the officers a particularized, objective and reasonable basis for suspecting that, at the time of the stop, Pressley was engaged in drug dealing. See e.g., United States v. Arvizu, 534 U.S. 266, 273 (2002). In the absence of such articulation the intrusiveness and duration of Pressley's detention or seizure was not reasonably related to the circumstances that justified the stop in the first instance and thus constituted an unreasonable restraint on Pressley's liberty in violation of the Fourth Amendment. As a result, the evidence obtained from the search of Pressley's car must be suppressed. See, e.g., Florida v. J.L., 529 U.S. 266, 271 (2000).

# CONCLUSION

For the foregoing reasons, Pressley's motion to suppress evidence [doc. # 25] is GRANTED. Because both counts of the indictment are based on evidence seized from the unlawful search and arrest of Pressley on August 18, 2010, his motion to dismiss the indictment [doc. # 26] is also GRANTED.

SO ORDERED.

/s/ Ellen Bree Burns, SUSDJ

ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this _____20th_____ day of May, 2011.